UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA,

        V.                            18 Cr 585 (VB)

CHRISTOPHER SHELP,

                Defendant.
-----------------------------------------------------X

## SENTENCING MEMORANDUM ON BEHALF OF

## CHRISTOPHER SHELP

Larry Sheehan
177 East 161st Street
Second Floor
Bronx, NY 10451
917-417-0490

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA,

      V.                            18 Cr. 585 (VB)

CHRISTOPHER SHELP,

                   Defendant.
--------------------------------------------------X

## PRELIMINARY STATEMENT

CHRISTOPHER SHELP is scheduled to be sentenced on September 13, 2019, following his guilty plea, pursuant to a plea agreement, to count one of the indictment charging him with conspiracy to distribute and possess with intent to distribute mixtures and substances containing one (1) kilogram or more of heroin, in violation of section 21 United States Code Section 841(b)(1)(A).

Christopher Shelp was arrested on February 1, 2019 and was detained by the Magistrate on March 15, 2019.

On June 4, 2019, Christopher Shelp entered a guilty plea pursuant to a plea agreement and has remain remanded pending sentence.

It should be noted, Mr. Shelp accepts full responsibility for his actions.

He was unfortunately seduced by co-conspirators to become involved in the instant offense by the lure of money and an overwhelming addiction to heroin.

Once he began to commit these crimes he felt trapped to continue his role in the conspiracy. He deeply regrets his criminal conduct.

Since his arrest on these charges he has had substantial time to contemplate his life and the decisions he has made.  Even prior to his arrest he realized the mistakes he made and is determined not to make the same ones again.  He realizes he can't turn to a quick fix in order to solve the problems life throws at him.  He now realizes that it takes hard work and dedication to a task to get ahead in life and he is determined to live life in a law abiding fashion and not attempt to take the easy way out.  Mr. Shelp has a serious, life-long problem with alcohol and drugs. Indeed, several of his adult arrests and convictions are drug or alcohol related.  He is determined to live a drug free life.  He is determined not to make the same mistakes he has made in the past.  He wants and needs to show his family and friends that he can lead a law abiding life, drug free life and yet, be successful.

He is determined not to let his family down and more importantly not let himself down. This court may also take into account the defendant's remorse in its 3553 (a) analysis.  As the Third Circuit stated "this court can also specifically cite remorse for what he has done to his family and the community.  **United States v. Howe,** 543 F3d 128 (3rd Cir. 2008).

As the Court is aware, the Supreme Court in **United States v. Booker**, 543 U.S. 220 (2005) overturned the mandatory nature of the Guidelines.

As the Supreme Court explained in **Gall v. United States**, 128 S.Ct. 586, 597 (2007), "A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however,   Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of  the section 3553 (a) factors to determine whether they support the sentence requested by a party.

In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  In short, the courts statutory responsibility is "to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing."  **Kimbrough v. United States**, 128 S.Ct. 558, 571 (2007).

In addition, the notion that a "sufficient, but not greater than necessary" sentence exists only within the confines of the advisory Guidelines is specious, and has been rejected by the court. **United States v. Williams**, 372 F.Supp. 2d 1335, 1337 (M.D. Fla. 2005). The Second Circuit has underlined this requirement: "Plainly, if a district court were to explicitly conclude that two sentences equally served the statutory purpose of Section 3553(a), it could not, consistent with the parsimony clause, impose the higher." **United States v. Ministro-Tapia**, 470 F.3d 137, 142 (2d Cir. 2006). Thus, a sentencing court is to impose the shortest sentence that achieves the purposes of sentencing.

It should be noted at the outset that the Guidelines are flawed in their construction by the fact that the Guideline range is constructed solely of aggravating factors.  The only mitigating factors are acceptance of responsibility point and role in the offense.  Mitigating factors are not part of the Guideline range and the policy statements attached to the Guidelines highly discourage the use of mitigating factors as a basis for departure.   The Supreme Court has urged each sentencing court to consider all mitigating factors and not follow the policy statements of the Guidelines that are against the use of mitigating factors.  **United States v. Rita**, 551 U.S. 338 (2007) and **United States v. Gall**, 552 U.S. at 50 n.6, 58-60.  **Gall** at 59 n.11 requires that a sentencing court consider all "kinds of sentences available" by Section 3553 even if the Guidelines only recommend a prison sentence.

Ultimately, § 3553(a) requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public and rehabilitation of the Defendant. See; **United States v. Williams**, 475 F.3d 468, 476-77 (2nd Cir. 2007).

Post Booker, when sentencing a Defendant, a district court must consider all sentencing factors enumerated in 18 U.S.C. § 3553(a). Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the Defendant;

(2) the need for the sentence imposed –
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the Defendant; and
(D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

See, 18 U.S.C. § 3553(a) (2007).

Section 3553 (a)(1) requires a sentencing court to consider the nature and circumstances of the offense and the history of the defendant.

## CHILDHOOD

Christopher Shelp had a difficult life growing up.  He was born in 1993.  His parents separated when he was young and he resided with the mother and siblings.  While in elementary school he was diagnosed with ADHD and was prescribed medication.  In 2009, the family relocated to North Carolina.  In 2011, he returned to Middletown and began to sell drugs to support himself.  In 2014, Mr. Shelp became heavily involved with drugs.  This was after his father remarried and his relationship with his father began to deteriorate.

At the age of one year, his mother became involved in a relationship with Charles Kirby, who used illegal drugs in front of his children which led to frequent arguments between Kirby and his mother.

Unfortunately, Christopher grew up without a male role model.  There can be no doubt that this contributed to his downfall.  "Collectively, our findings indicate that role models can help adolescents overcome the risk they face by being exposed to negative nonparental adult behavior. Although role models played different roles for different adolescent psychological outcomes, overall, the results support resilience theory. Having someone to look up to appears to be an asset for adolescents, but this asset may not be universally applicable to all adolescent outcomes.

Our findings are consistent with the notion that adults may be vital resources to help protect youth from noxious effects of risk they face." (Fergus & Zimmeran, 2005;

).

Mr. Shelp had a very difficult economic life growing up.  He was born and raised under poor socioeconomic conditions.

There is no minimizing the seriousness of this offense.  However, the defendant realizes the harm he has cost to the country, himself and his family.  He has no desire to return to that life and knows it will only result in a jail sentence and disappointing and harming his family, especially his innocent children. He wants to be a productive member of society and not a drain on his family and community.

It has been noted that it is a very substantial matter when a defendant accepts responsibility and does not persist in denying his criminal conduct, thereby forcing the Government to go to trial.  **United States v. Rattoballi**, 452 F.3d 127, 130 (2d Cir. 2006).


## VIOLENCE IN MR. SHELP'S NEIGHBORHOOD
## AND ITS IMPACT ON HIM

Mr. Shelp grew up and lived in a neighborhood where violence and drug distribution were a common occurrence.  He faced stress and tension each day that he traveled between home, school and work.

Mr. Shelp's neighborhood was overrun with drugs and violence.   As is common in communities with high rates of drug sales, violence was a regular experience throughout his life, both as an observer and a victim.

In 2012, the U.S. Attorney General's task force on Children exposed to Violence described the effect of living in an area filled with violence for children. The report showed a connection between children exposed to various forms of violence such as physical abuse, community violence and parental neglect that interfere with the healthy development of children such as Mr. Shelp. (Http//www.justice.gov/defendingchildhood/cev-rpt-full.pdf).

Mr. Shelp experienced a number of risk factors during his childhood and young adulthood particularly parental abandonment, and ongoing exposure to substance abuse. Overtime, these experiences had a negative effect and influence on his development. These also opened the door for him to be at risk for criminal activity as an adult.

**SUBSTANCE ABUSE**

Mr. Shelp, during his pre-sentence interview, admitted to using marijuana at the age of fourteen. By the time he was sixteen he was using the drug several times a day until his arrest for the instant offense. Moreover, at 17, he began to use prescription medication and became addicted; he was using 3 pills daily.

In January of 2018, he began to use heroin and was using four bundles daily up until his arrest. Indeed, when he was first presented to the Court he was nothing but skin and bones and in my humble opinion had one foot in the grave.

He is in desperate need of drug abuse treatment and requests that your honor recommend to the Bureau of Prisons that he attend to the 500 hour drug and alcohol program.

**POST OFFENSE REHABILITATION**

Since his incarceration in February of this year Mr. Shelp has made efforts to rehabilitate and improve himself. His behavior at MDC has been exemplary. He has had no disciplinary issues during this period and has actually been employed since his entrance into the facility.

Section 3553 (a)(2) requires the court to consider the history and characteristics of the defendant.  He is a twenty-five year old , soft spoken, polite, respectful, gentle young man who hopes to eventually reside with his mother upon his release.

While financial problems and family life is no excuse for his actions it does explain them and serve as a background as to why he ended up where he did.  At the time of the conspiracy he was only twenty-three years old.  While that is old enough to be treated as an adult, such a young person does not have the maturity and life experiences of an older person, and cannot be expected to exhibit the judgment of an older person.  **Johnson v. Texas**, 509 US 350, 367 (1993).

Section 3553 (a)(2)(B) requires that the sentence provide adequate deterrence to criminal conduct.  This requires a court to consider both "general" and "specific" deterrence. Regarding specific deterrence Mr. Shelp realizes not only the wrong he has done herein but he has come to learn that he must change and has changed his lifestyle.  He understands that this short period of criminal activity has ceased and will never return.

A sentencing court must also consider "general deterrence" when deciding a sentence.

The experts have conducted many studies and they have routinely found that there is **no** empirical relationship between sentence length and specific or general deterrence. In all categories of crime from white collar to drug offenses, from violent crimes to larcenies severe sentences have proven not to deter crime.

The studies have shown however that lengthy sentences do increase the rate of recidivism. See, generally Jalila Jefferson-Bullock,

The Time is Ripe to Include Considerations of the Effects on Families and Communities of Excessively Long Sentences, 83 UMKC L. Rev. 73 (2014) and  Lynne M. Vieraltis et. Al., The Criminogenic Effects of Imprisonment: Evidence from State Panel Date 1974-2002, 6 Criminology & Pub.  Pol'y 589, 591-93 (2007), U.S. Sent'g Comm'n Staff Discussion Paper, Sentencing Options under the Guidelines 18-19 (Nov. 1996).

Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the scientific research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system that there would be without one. But the question for this Court is "marginal deterrence", i.e., whether any particular quantum of punishment results in increased deterrence and thus decreased crime.  Here the findings are uniformly negative: there is no evidence that increases in sentence length reduces crime through deterrence.

Current empirical research on general deterrence shows that while certainty or punishment has a deterrent effect, "increase in severity of punishments do not yield significant (if any) marginal deterrent effects…Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A review of Research 28-29 (2006).

The fact that "general deterrence" is not considered by people considering committing crimes is best demonstrated by the studies of white collar crimes.  For purposes of argument it can be rationally presumed that the white collar criminal is the most rational of criminal offenders.  That if any criminal offenders were going to consider all of the pluses and minuses of committing a criminal act, a white collar criminal would be most likely to indulge in that type of thinking.

However, the studies show that there is no difference in the deterrence factor between probation and imprisonment for white collar offenders.  That is, offenders given terms of probation were no more or less likely to reoffend than those given prison sentences.

See, David Weisburd, et. Al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995).  This has proven to be true even in narcotics cases.  In a very recent study of drug offenders sentenced in the District of Columbia, researchers tracked over a thousand offenders whose sentences varied substantially in terms of prison and probation time.  Donald P. Green & Daniel Winik, Using Random judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders _ Criminology _ (2009).  The results showed that variations in prison and probation time "have no detectable effect on rates of re-arrest."

"Those assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four year time frame."  In other words, "at least among those facing drug-related charges, incarceration and supervision seem not to deter subsequent criminal behavior." Id.

The reason for this is that potential criminal are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. Tonry, Purposes and Functions of Sentencing at 28-29.  A recent review of this issue concluded: "There is generally no significant association between perceptions of punishment levels and actual levels…implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, The Missing Link in General Deterrence Theory, 43 Criminology 623 (2005).

The Commission itself has found that "there is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.

While surprising at first glance, this finding should be expected. The Guidelines offense level is not intended or designed to predict recidivism." See, USSC, Measuring Recidivism at http:www/ussc.gov/public/recidivism General.pdf.

This court in considering what sentence the defendant should receive for his conduct must of course consider "general deterrence" but based on the above studies it is respectfully submitted that this Court should consider "specific deterrence" to a greater degree than "general deterrence".

Section 3553(a)(2)(C) also requires that the sentence protect the public from further crimes of the defendant. The public has nothing to fear from Mr. Shelp. This Court will never see him again. The defendant has spent a considerable amount of time rehabilitating himself and no one can say he was not punished for his acts. The defendant's goals are to deal with his substance abuse problem and to obtain work upon his eventual release.

Thus, based on the rehabilitative effect the public will be protected. Prison time is not necessary to deter criminal conduct by others.

General deterrence is difficult, if not impossible, to measure; however, most studies have noted that it is the certainty of prosecution for an offense (i.e. getting caught) that creates a real deterrent, not the particular sentence for the offense. See Sarah French Russell, Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing, 43 U.S. Davis L. Rev. 1135 (2010)(collecting studies demonstrating that while certainty of punishment may improve general deterrence, the imposition of longer sentences does not).

Section 3553 (a)(2)(D) that a sentence should proved the defendant with needed vocational training. Mr. Shelp is willing to take any courses or programs that the Court deems necessary to make his transition back into society smoother.

As a wise jurist once said, "no chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience.

While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula." **United States v. Coughlin**, 2008 Wl 313099 (W.D. Ark 2008).

In determining the proper sentence, 18 U.S.C. § 3553(a)(6) instructs the court to consider, *inter alia*, the need to avoid unwarranted disparities. The primary purpose of the disparity factor is to "minimize nationwide disparities." **United States v. Fernandez**, 443 F.3d 19, 31 n. 9 (2d Cir.2006). However, in **United States v. Wills**, 476 F.3d 103, 110 (2d Cir. 2007), the Second Circuit rejected the government's view that the district court erred by considering co-defendant disparity rather than disparity among defendants nationwide pursuant to 18 U.S.C. § 3553(a)(6). Under the advisory Guidelines scheme explicated in *Booker,* it is appropriate for a district court, relying on its unique knowledge of the totality of circumstances of a crime and its participants, to impose a sentence that would better reflect the *extent* to *which* the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly. **Wills** at 108. On litigating the issue of unwarranted disparity, counsel for the defense is generally at a decided disadvantage, since counsel for the defense is rarely in possession of the plea agreements and sentences ultimately imposed upon co-defendants.

Christopher Shelp, along with his family and friends has suffered greatly for his crime. He has embarrassed and shamed his family, notwithstanding, they still stands by him, as gleaned by letter attached herein.  Additionally, he has suffered the immense shame from society that accompanies a criminal conviction and a prison sentence. He clearly understands the terrible consequences that would attend any repeat violation.

13

It is unnecessary, to impose a long jail sentence, in order to achieve the Section 3553(a)(2) goal of deterring him from future criminal conduct.

Not only has Christopher Shelp experienced firsthand the serious consequences of violating the drug laws, but a significant body of research also demonstrates that adding extra prison time does little of nothing to prevent recidivism. Indeed, it has been found that rehabilitation is significantly better at deterring further offenses that is prison time, which has been found to correlate to higher rates of recidivism of felony offenders: A focus on Drug Offenders, 40 Criminology, 329 (May, 2002).

While the benefit to society at large of incarcerating Christopher Shelp is negligible, the risks and harms both to him and his family and, through them, to society as a whole are significant. See, e.g. Marcia J. Carlson, Family Structure, Father Involvement, and Adolescent Behavioral Outcomes, 69 Journal of Marriage and Family 137 (2006)(extensive research confirms that "living apart from one's biological father or mother is associated with a greater risk of adverse outcomes for children and adolescents, regardless of race, education, or mother's remarriage.

He has taken full responsibility for his actions and has been punished severely for the same. He wants to turn his life around. His family needs him.

Imprisonment would leave lasting scars on all of them. He would miss Despite how heavily him punishment has weighed on him, though, I have no doubt that Christopher Shelp will emerge stronger and wiser from his ordeal.

By accepting responsibility for his actions and turning his energies to his rehabilitation, he has demonstrated that he is eager to apply the drive noted by those around him to build a new, better life for himself and more importantly his family.

Given the chance, he will take this experiences for what it should be the opening of a new chapter in a life still full of family and potential.  A court's duty is to always sentence a defendant as he stands before the court on the date of sentencing.  **United States v. Bryson**, 229 F3d 425 (2d Cir. 2000).

Christopher Shelp is not the same individual who appeared before the Court on his presentation on the complaint.  He is a remorseful man who now knows and accepts the errors of his ways.  His criminal acts are already a part of his past.

CONCLUSION

It is hoped that the instant memo gives this Honorable Court an adequate scope and jurisdiction in which to impose the appropriate sentence on Christopher Shelp.

Attached to this submission please find a letter from Mr. Shelps mother, a work performance rating from the Federal Bureau of Prisons and a certificated issued to Mr. Shelp upon his completion of a drug treatment course.

Dated: September 3, 2019

Respectfully submitted,

Larry Sheehan